| | |
|---|---|
| **TENNESSEE RIVERKEEPER, INC.,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:20-cv-00052 |
| ) | |
| **THE CITY OF LAWRENCEBURG,** ) | JUDGE CAMPBELL |
| **TENNESSEE, ACTING BY AND** ) | MAGISTRATE JUDGE HOLMES |
| **THROUGH THE LAWRENCEBURG** ) | |
| **BOARD OF UTILITIES** ) | |
| **COMMISSION d/b/a** ) | |
| **LAWRENCEBURG UTILITY** ) | |
| **SYSTEMS,** ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM

Plaintiff Tennessee Riverkeeper, Inc. ("Riverkeeper") brings this action under the citizen-suit provisions of the Clean Water Act, 33 U.S.C. §§ 1251, *et seq*. Riverkeeper claims Defendant the City of Lawrenceburg, Tennessee, acting by and through the Lawrenceburg Board of Utilities Commission, doing business as Lawrenceburg Utility Systems ("LUS") violated the Clean Water Act by failing to comply with the terms of its discharge permit.

Before the Court are cross motions for summary judgment (Doc. Nos. 56, 59) which are fully briefed with memoranda of law (Doc. Nos. 57, 60), responses (Doc. Nos. 62, 64), and replies (Doc. Nos. 65, 66). The parties also filed and responded to statements of undisputed material facts (Doc. Nos. 58, 64-4, 63, 65-1, 60-1).[1]

---

[1] For ease of reference the Court cites Defendants' Statement of Undisputed Material Facts together with Plaintiff's response (Doc. No. 64-4) as "Def. SOF ¶__"; Defendant's Statement of Additional Material Facts and together with Plaintiff's response (Doc. No. 65-1) at "Def. Add. SOF ¶__"; and Plaintiff's Statement of Undisputed Material Facts together with Defendant's response (Doc. No. 63) as "Pl. SOF ¶__."

For the reasons stated below, Defendant's Motion for Summary Judgment will be GRANTED IN PART and DENIED IN PART. Plaintiff's Motion for Summary Judgment will be DENIED.

## I. BACKGROUND

### A. The Clean Water Act

The Clean Water Act ("CWA") prohibits the discharge of pollutants into waters of the United States unless the discharge is done in compliance with some provision of the Act. *See* 33 U.S.C. § 1311; *S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians*, 541 U.S. 95, 102 (2004). The primary exception under which the CWA authorizes the discharge of pollutants is through the National Pollutant Discharge Elimination System ("NPDES"). *See* 33 U.S.C. § 1342. "Generally speaking, the NPDES requires dischargers to obtain permits that place limits on the type and quantity of pollutants that can be released into the Nation's waters." *S. Fla. Water Mgmt. Dist.*, 541 U.S. at 102. "Discharge of pollutants into the waters of the United States without a NPDES permit, or in violation of the terms of a NPDES permit, is typically a violation of the CWA." *Tenn. Clean Water Network v. Tenn. Valley Auth.*, 206 F. Supp. 3d 1280, 1285-86 (M.D. Tenn. 2016) (citing 33 U.S.C. §§ 1311(a), 1342(a), 1365(f)(6)).

The EPA has authorized the State of Tennessee to issue NPDES permits, which is done through the Tennessee Department of Environment and Conservation ("TDEC"). The parties agree that Defendant's discharge of pollutants from Outfall 001 into Shoal Creek is authorized and governed by TDEC-Issued NPDES Permit No. TN0022551 ("NPDES Permit"). (Def. SOF ¶ 1; Doc. No. 58-2; Doc. No. 58-4). The NPDES Permit authorizes Defendant to discharge treated municipal wastewater in accordance with effluent limitations, monitoring requirements, and other conditions. (*Id.*). The NPDES Permit prohibits sanitary sewer overflows, and requires a

moratorium on "new or additional flows [ ] added upstream of any point in the collection or transmission system that experiences greater than 5 sanitary sewer overflows or releases (greater than 5 events per year) [ ] or would otherwise overload any portion of the system." (Doc. No. 58-2 at PageID# 435; Doc. No. 58-4 at PageID# 512). The NPDES Permit allows the permit-holder to be relieved of this requirement if approved corrective measures are taken, "[u]nless there is specific enforcement action to the contrary." (*Id*.). Finally, the permit-holder must file monthly reports with TDEC that list known instances of "sanitary sewer overflows, releases, and bypasses." (Doc. No. 58-2 at PageID# 428; Doc. No. 58-4 at PageID# 505).

Under certain circumstances, the CWA allows private citizens to bring suit for violation of the CWA. *See S. Side Quarry, LLC v. Louisville & Jefferson Cty. Metro Sewer Dist.*, 28 F.4th 684, 690 (6th Cir. 2022) (citing 33 U.S.C. § 1365(a)(1)). Primary enforcement authority, however, lies with the EPA and state governments. *Id*. (citing *Askins v. Ohio Dep't of Ag.*, 809 F.3d 868, 875 (6th Cir. 2016)) ("The citizen suit serves only as a backup, 'permitting citizens to abate pollution when the government cannot or will not command compliance.'"). "Before a potential plaintiff can file a citizen suit, he must … give the purported polluter warning of his intent to sue and of the alleged violation." *Id*. (citing 33 U.S.C. § 1365(b)(1)(A)). The notice must include 'the activity alleged to constitute a violation,' 'the person or persons responsible,' and the 'location' and 'dates' of the violation." *Id*. at 693 (citing 40 C.F.R. § 135.3(a)).

## B. TDEC Notices of Overflows

Defendant's monthly summary reports show 116 sanitary sewer overflows from its sewage collection system between September 6, 2016, and April 12, 2020. (Pl. SOF ¶ 4; Doc. Nos. 59-4, 59-5, 59-6, 59-7). Between February 12, 2018, and March 26, 2020, TDEC notified Defendant that more than five "overflows" had occurred during the preceding 12 months at the following locations: West Point Pump Station (February 12, 2018), Veterans Park (February 25, 2020), Garner Lane (February 25, 2020), and Simms Street (March 26, 2020).[2] (Doc. Nos. 58-3, 58-5). TDEC stated that it had determined that "chronic overflow conditions exist at [a specified point] in the utility system's collection system." (*Id.*). TDEC further stated, "As of the date of this letter, the utility shall enforce a self-imposed moratorium on connections to the wastewater collection system that ultimately flow to the [specified point]." (*Id.*). Finally, the letters informed Defendant of the requirements for lifting the moratorium by taking steps to correct the problem. (*Id.*).

Defendant responded to TDEC on March 18, 2020, and April 1, 2020. (Doc. No. 58-3, 58-5). Defendant stated that it had imposed the required moratoria and explained the process it would use to implement the moratoria. (Doc. No. 58-3 at PageID# 492-93; Doc. No. 58-5 at PageID# 571-72, 577-78). Defendant also informed TDEC that its engineering consultant, Griggs and Maloney, Inc., was assisting in completing a comprehensive assessment of the chronic overflow areas and that Defendant intended to take corrective measures. (*Id.*). Defendant further explained that it had determined the chronic overflows at Veterans Park, Garner Lane, and Simms Street involved three manholes that were located on the same line and that it had located and repaired a

---

[2] The NPDES Permit prohibits "sanitary sewer overflows," which are defined as "the unpermitted discharge of wastewater from the collection or treatment system other than through the permitted outfall." (Doc. No. 58-2 at PageID# 435, 450; Doc. No. 58-4 at PageID# 512, 527).

4

"significant source of inflow" and was in the process of removing a "significant downstream blockage that is causing the line to surcharge and create the overflows." (Doc. No. 58-5 at PageID# 571-74, 577-79). Defendant requested a meeting with the Division of Water Resources EFO to petition for a waiver based on mitigating evidence. (*Id*.).

**C. Notice and Litigation**

On June 10, 2020, Riverkeeper notified Defendant of alleged violations of the CWA arising out of overflows between September 6, 2016, and April 12, 2020.[3] (*See* Doc. No. 12-1).

Plaintiff initiated this suit on September 9, 2020, and filed a First Amended Complaint on November 4, 2020. (*See* Compl., Doc. No. 1; Am. Compl., Doc. No. 12). As relevant to the pending motions, Plaintiff alleges Defendant violated the CWA by operating its sewage treatment plant in a manner which discharges pollutants to the waters of the United States and the waters of the State in violation of its NPDES Permit (Count I), and by failing to impose and enforce a moratorium on new sewer connections upstream of any location that has experienced chronic overflows as required by its NPDES Permit (Count 2). (*Id*.). Plaintiff seeks an assessment of civil penalties for each day Defendant discharged pollutants in violation of its NPDES Permit and injunctive relief enjoining ongoing violations of the CWA. (*Id*.).

---

[3] Defendant argues that "to the extent Plaintiff seeks relief in connection with any alleged ongoing violations or alleged violations not described in the Notice, those allegations should be dismissed." (Doc. No. 57 at 19). In its response to Defendant's motion, Plaintiff did not disagree. (*See* Doc. No. 64). Accordingly, the Court finds Plaintiff's claims are limited to those concerning the alleged overflows listed in the Notice.

### D. The Consent Order and Assessment

While this case was pending, on January 11, 2022, LUS and TDEC entered into a Consent Order and Assessment ("Consent Order") related to alleged overflows by Defendant in violation of the NPDES Permit and the subsequent moratoria. (*See* Doc. No. 58-5 at PageID# 580-597). The Consent Order focuses on overflows at the following locations: Veterans Park, West Point Pump Station, Simms Park Manhole, Garner Lake Manhole, Brock Street, Old Iron Bridge, Tripp Road Manhole, Etheridge Pump Station, and Old Florence Road. (*Id*. § VIII). It references overflows that occurred at specified locations between approximately March 2017 through June 2021. (*Id*. §§ VII-VIII).

The Consent Order assessed a civil penalty of $96,900.00 against LUS, and required LUS to either pay an additional penalty or propose a supplemental environmental project to offset the penalty. (*Id*. § X, ¶¶ 1, 2). The Consent Order required LUS to maintain the moratoria at West Point Pump Station, Veterans Park, Simms Park, and Garner Lane until modified or rescinded by TDEC, and also required LUS to submit and implement interim and long-term corrective actions and programs to achieve compliance with the NDPES Permit within five years. (*Id*. § X, ¶¶ 3-13). Finally, the Consent Order provided that "[f]ailure to comply with the requirements of th[e] Consent Order and Assessment could lead to further enforcement actions which may include additional civil penalties, assessment or damages and/or recovery of costs." (*Id*. at 15).

### E. Summary Judgment

Both parties seek summary judgment. (*See* Doc. Nos. 56, 59). Defendant argues the Court cannot or should not hear the case for several reasons, including: (1) Riverkeeper lacks standing to bring this suit; (2) abstention is warranted under the principles announced in *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976), and/or *Burford v. Sun Oil Co*.,

319 U.S. 315 (1943); and (3) the Consent Order renders this case res judicata.[4] (Doc. No. 57 at 7-15; Doc. No. 62 at 9-12; Doc. No. 66 at 2).

Finally, if the Court reaches the merits of the claims, Defendant argues Riverkeeper has no proof that any pollutant reached a navigable water. (*Id*. at 15-17). Defendant also seeks dismissal of the claim in Count 2 on grounds that the failure to impose a moratorium is not a per se violation of the CWA and because Defendant did, in fact, impose moratoria at all of the locations alleged in the Amended Complaint. (*Id*. at 17-18). Plaintiff concedes to dismissal of Count 2. (Doc. No. 64 at 20).

Plaintiff's Motion for Summary Judgment seeks judgment in its favor as to Count 1. (Doc. Nos. 59, 60). Plaintiff contends the evidence shows that Defendant discharged a pollutant into navigable waterways in violation of its NPDES permit. (*Id*.). Defendant disagrees. (Doc. No. 62).

## II.     STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Rodgers v. Banks,* 344 F.3d 587, 595 (6th Cir. 2003). The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating an absence of evidence to support the nonmoving party's claims. *Id.*

---

[4] Defendant raises *Burford* abstention in its Response to Plaintiff's Motion for Summary Judgment (Doc. No. 62 at 9-12) and Reply in Support of Defendant's Motion for Summary Judgment (Doc. No. 66 at 2).

In evaluating a motion for summary judgment, the Court views the facts in the light most favorable for the nonmoving party and draws all reasonable inferences in favor of the nonmoving party. *Bible Believers v. Wayne Cty., Mich.*, 805 F.3d 228, 242 (6th Cir. 2015); *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003). The Court does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Rather, the Court determines whether sufficient evidence has been presented to make the issue of material fact a proper jury question. *Id.* The mere scintilla of evidence in support of the nonmoving party's position is insufficient to survive summary judgment; instead, there must be evidence from which the jury could reasonably find for the nonmoving party. *Rodgers* 344 F.3d at 595.

### III. ANALYSIS

**A. Standing**

Plaintiff Riverkeeper is an organization dedicated to the preservation, protection, and defense of the Tennessee and Cumberland Rivers and their tributaries. As an organization, Riverkeeper has standing to bring a claim when: "[1] its members would otherwise have standing to sue in their own right, [2] the interests at stake are germane to the organization's purpose, and [3] neither the claim asserted, nor the relief requested, requires the participation of individual members in the lawsuit." *Sierra Club v. EPA*, 793 F.3d 656, 661 (6th Cir. 2015) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167 (2000)).

Here, the second and third elements are not disputed by Defendant and are easily satisfied. The interests at stake in this case are germane to Riverkeeper's stated purpose of preserving and protecting the Tennessee and Cumberland Rivers and it does not appear that the claim asserted, or the relief requested, requires participation by individual members of the organization. The first

element – that the organization's members would have standing – is the only one challenged by Defendant. Riverkeeper bases standing on its member, Neal Marshall Nichols III.

To show that Mr. Nichols himself has standing, Plaintiff must demonstrate: (1) an injury in fact; (2) a causal connection between the alleged injury – that the alleged injury is fairly traceable to the challenged action; and (3) redressability – that the injury will likely be redressed by a favorable decision. *Id*. (citing *Klein v. Dep't of Energy*, 753 F.3d 576, 579 (6th Cir. 2014)). Plaintiff has the burden of establishing these elements. *Id*. at 662 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

In his Declaration, Mr. Nichols states that he lived in Lawrenceburg, Tennessee, for one year – from July 2019 to July 2020. (Doc. No. 12-2, ¶ 3). "Just around the corner from where [he] lived, there were three manholes on Garner street that overflowed with sewage whenever there was a heavy rain. Sewage from these manholes would shoot straight into the air and then run off into Shoal Creek. The smell was awful." (*Id*., ¶ 4). He stated that he would go to Davy Crockett State Park or Veterans Park every weekend, but would not swim or fish in the water because of the "sewage in the creek." (*Id*., ¶ 5). Mr. Nichols no longer lives in Lawrenceburg, but still returns to the parks with his children. (*Id*., ¶ 6). He says the parks would be more enjoyable if the water was clean and the sewage removed. (*Id*., ¶¶ 6, 7). During his deposition, Mr. Nichols was asked whether he or anyone he knew had tested the water. (Nichols' Dep., Doc. No. 58-7 at PageID# 616). He responded that he saw a news program reporting that 3M tested the water and advised people not to eat fish from the Tennessee River or its tributaries because of "[m]ercury levels and other contaminants." (*Id*.).

Defendant contends Mr. Nichols does not have standing because his injury – not being able to swim or fish in Shoal Creek – is not traceable to alleged pollution by Defendant. Defendant

points to Mr. Nichols' deposition testimony that he had seen news reports that water testing indicated mercury and other contaminants in the water. (Doc. No. 57 at 8). From this testimony, Defendant concludes that "the injury alleged by Mr. Nichols (being unable to swim or fish in Shoal Creek) is more 'fairly traceable' to the mercury contamination found by the 3M testing[.]" (*Id*.). Defendant adds that it is "merely speculative" that a favorable decision in this case would redress Mr. Nichols' alleged injury because correcting the alleged discharges would not remedy the mercury levels. (*Id*.).

Defendant's focus on reports of mercury in the water is misplaced. This portion of deposition testimony was in response to a question asking whether Mr. Nichols had tested the water or knew anyone who had tested the water. (*See* Nichols' Dep., Doc. No. 64-3 at PageID# 932). He responded that he had seen a news report about mercury and other contaminants. (*Id*.). But he also testified that he had personally seen sewage shooting at least three feet in the air from manholes that are about 15 to 20 feet from the creek, that the sewage was "flowing directly into the creek," and that he would not fish or swim in the creek because of the sewage. (*Id*. at Page ID# 933-34, 944; Nichols' Decl., Doc. No. 12-2 at ¶ 4-5). Nothing in the record suggests that Mr. Nichols would not swim or fish in the water if the sewage contamination was resolved.

On this record, Mr. Nichols' alleged injury – not being able to swim or fish in the water – is fairly traceable to the sewage discharge, and the injury is redressable. Therefore, Mr. Nichols would have standing to bring the claims in this case, and, by extension, Riverkeeper has standing.

10

Case 1:20-cv-00052   Document 70   Filed 07/18/23   Page 10 of 18 PageID #: 1017

## B. Abstention

Defendant argues the Court should abstain from hearing Riverkeeper's claims under the principles announced in *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976), and/or *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943).

1. *Colorado River*

In *Colorado River*, the Supreme Court recognized that "considerations of judicial economy and federal-state comity may justify abstention in situations involving the contemporaneous exercise of jurisdiction by state and federal courts." *Romine v. Compuserve Corp.*, 160 F.3d 337, 339 (6th Cir. 1998) (citing *Colorado Rive*, 424 U.S. at 817). Abstention in deference to a parallel state proceeding is at the discretion of the district court. *Id*. at 338. In considering whether to defer to concurrent jurisdiction of a state court, the district court must first determine whether the federal and state proceedings are, in fact, parallel. *Id*. at 339. If so, the Court proceeds to consider a non-exhaustive list of "important factors," including the "danger of piecemeal litigation" – which was the paramount consideration in *Colorado River*. *Id*. at 340-341. "Piecemeal litigation occurs when different courts adjudicate the identical issue, thereby duplicating judicial effort and potentially rendering conflicting results." *Id*. (citing *LaDuke v. Burlington Northern R.R. Co.*, 879 F.2d 1556, 1560 (7th Cir. 1989)). When the outcome of the federal and state actions depends on the resolution of the exact same issue, "[t]he threat of piecemeal results is [] especially high." *Id*. at 341.

Although dismissal is not prohibited, when abstaining under *Colorado River*, district courts usually stay the federal proceeding pending resolution of the state proceedings. *See Bates v. Van Buren Twp.*, 122 F. App'x 803, 808 (6th Cir. 2004) (concluding a stay is the best way to effectuate *Colorado River* abstention).

11

The issues in this case are not simultaneously before federal and state courts. To the extent the TDEC enforcement action and resultant Consent Order can be considered a "state court action" for purposes of *Colorado River* abstention, the state matter is effectively resolved. Indeed, Defendant characterizes the Consent Order as "providing a final determination as to the issues in this suit." (Doc. No. 57 at 12).

Because the state action is resolved, the Court finds the "narrow exception" to the "virtually unflagging obligation of the federal courts to exercise the jurisdiction given to them" is not warranted. *See Colorado River*, 424 U.S. at 813 ("The doctrine of abstention … is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it.").

2. *Burford*

Defendant also argues abstention is appropriate under *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943). "*Burford* counsels abstention by federal courts '(1) when there are difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case at bar; or (2) where the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.'" *Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 480 (6th Cir. 2004) (quoting *New Orleans Pub. Serv. Inc., Council of New Orleans*, 491 U.S. 350, 361 (1989)).

Defendant contends that "by seeking relief beyond the relief already granted in the Consent Order, Plaintiff is inviting the Court to second-guess the policy decision reached by TDEC in negotiating the Consent Order with LUS." (Doc. No. 62 at 11). Defendant argues that by seeking civil penalties and injunctive relief beyond that negotiated in the Consent Order, Plaintiff is effectively seeking federal review of TDEC's policy-based enforcement decisions which would

12

be "disruptive of Tennessee's efforts to enforce the CWA and [Tennessee Water Quality Control Act] and maintain a coherent policy with respect to the state's water-quality management." (*Id*. at 11-12).

Plaintiff points to *Ellis v. Gallatin Steel Co.* as illustrative of the appropriateness of *Burford* abstention in this case. (Doc. No. 62 at 10 (citing *Ellis*, 390 F.3d 461)). In *Ellis*, the plaintiffs filed a Clean Air Act and other claims against the manufacturers of a steel manufacturing facility and slag processing plant, alleging that those defendants failed to obtain proper permits for their air emissions. 390 F.3d at 466. After the plaintiffs filed suit, the EPA also sued the companies under the Clean Air Act and eventually entered into separate consent decrees with each company, which required the companies to implement compliance measures and pay civil penalties. *Id*. at 468. One of the consent decrees did not address the permit-related claims. *Id*. at 479. Nevertheless, the district court determined that the permit claims would not proceed because "they constituted a 'collateral challenge' to the state agency's permitting decisions." *Id*. The Sixth Circuit agreed, finding *Burford* abstention appropriate because the permitting decisions were an issue committed to state resolution and state had developed its own regulations and provided a scheme for administrative and judicial review of permitting decisions, and federal review would be disruptive of the state's efforts to establish a coherent policy. *Id*. at 480 (citing *Coalition for Health Concern v. LWD, Inc*., 60 F.3d 1188 (6th Cir. 1995)). *Id*.

The Court is not persuaded *Burford* abstention is appropriate in this case. Unlike in *Ellis*, where the issue was whether a permit for air emissions was required, such policy considerations are not at issue here. Defendant has a NPDES Permit. Plaintiff is not challenging the regulatory scheme or the policy decisions involved in granting the permit. To the contrary, its claim is based on the enforcement of the current regulatory scheme, which is not the sort of state policy decision

13

typically warranting abstention under the principles articulated in *Burford*. Perhaps, under a different regulatory scheme, enforcement decisions could be the sort of state policy decision warranting abstention. But such is not the regulatory scheme established by the Clean Water Act, which specifically allows for citizen suits as part of its overall enforcement mechanism. *See* 33 U.S.C. § 1365(a); *Sierra Club v. Hamilton Bd. of Cty. Com'rs*, 504 F.3d 634, 637 (6th Cir. 2007) (citing) ("Although the primary responsibility for enforcement rests with the state and federal governments, private citizens provide a second level of enforcement and can serve as a check to ensure the state and federal governments are diligent in prosecuting Clean Water Act violations.").

Moreover, the Clean Water Act provides for limitations on citizen-suits through the notice requirement discussed above or if the EPA or the State "has commenced and is diligently prosecuting a civil or criminal action in a court of the United States or a State to require compliance with the standard, limitation, or order…" 33 U.S.C. § 1365(b)(1)(B). Defendant has not pointed to any provision of the Clean Water Act that mandates dismissal of a citizen-suit when an administrative Consent Order is entered during the litigation, despite the clear possibility of such an occurrence.

## C. Res Judicata

Defendant next argues that res judicata bars Plaintiff's claims, again relying on the Consent Order, which Defendant contends is a final decision on the merits of the claims brought in this case. Plaintiff argues Defendant has waived the res judicata defense by failing to timely assert the defense in a responsive pleading. The Court will first consider whether the defense has been timely raised.

14

Federal Rule of Civil Procedure 8(c) provides: "In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including … res judicata[.]"). As an affirmative defense, res judicata can be waived. *O'Brien v. Ed Donnelly Enter., Inc.*, 575 F.3d 567, 582 (6th Cir. 2009), *abrogated on other grounds by Campbell-Ewald Co. v. Gomez*, 577 U.S. 153 (2016).

There is no question that Defendant did not specifically plead the affirmative defense of res judicata based on the final Consent Order. Nor could it have raised res judicata when answering the Amended Complaint on March 5, 2021, because the Consent Order was not finalized until ten months later on January 11, 2022. (*See* Doc. Nos. 24 and 58-5).

Defendant argues it may raise res judicata on summary judgment despite not specifically pleading the defense in its answer because it pleaded a related affirmative defense – that "[t]he State of Tennessee has been diligently prosecuting the issues which form the subject matter of this lawsuit" – and Riverkeeper was, therefore, on notice that Defendant intended to rely on defenses related to the TDEC administrative enforcement. (Doc. No. 57 at 13 (citing Answer, Doc. No. 24 at 1)).

Riverkeeper argues Defendant cannot not rely on the affirmative defense because it was not timely raised and that this Court already decided the timeliness issues when the Magistrate Judge denied Defendant's motion for leave to amend its answer to assert res judicata as an affirmative defense. (*See* Doc. No. 64 at 13 (citing Doc. No. 49)). In the Order denying leave to amend the Answer, Magistrate Judge Holmes found Defendant had not shown good cause to amend. This determination was based on Defendant having waited several months after the Consent Order was final before seeking leave to amend, and that during that period several crucial case management deadlines passed, including deadlines to complete written fact discovery and

witness depositions, and Plaintiff's deadline for expert witness disclosures and reports. (Doc. No. 49 at 6). The Magistrate Judge also considered that even if Defendant was "not completely 'ready' to file the amended pleading by the deadline … it "could easily have sought relief from the amendment deadline" before it expired. (*Id*.). Notably, Defendant could have sought review of the order denying leave to amend and did not do so. *See* Fed. R. Civ. P. 72(a).

Defendant is not entitled to another bite at the apple. Having failed to timely raise the res judicata defense, Defendant may not do so now.

### D. The Clean Water Act Claim

To establish a violation of the Clean Water Act for unauthorized discharge of pollutants, a plaintiff must establish that a pollutant was added to navigable waters from a point source. *See Tenn. Clean Water Network v. Tenn. Valley Auth.*, 206 F. Supp. 3d 1280, 1306 (M.D. Tenn. 2016) (citing *Nat'l Wildlife Fed'n v. Consumers Power Co*., 862 F.2d 580, 583 (6th Cir. 1988)).

For purposes of its motion for summary judgment, Defendant challenges only Plaintiff's ability to establish that a pollutant reached navigable waters of the United States. (Doc. No. 57 at 15-16). Defendant argues Plaintiff did not perform any testing to show any pollutant reached navigable waters, and without evidence that a pollutant was added to navigable waters, Plaintiff's claim for violation of the Clean Water Act fails. (Doc. No. 57 at 16).

Not surprisingly, Plaintiff disagrees. Plaintiff argues that, not only is there evidence from which a reasonable jury could conclude that a pollutant reached navigable waters, the proof is such that summary judgment should be granted in its favor. Plaintiff points to the statements from Neal Nichols about his first-hand observations of sewage "shoot[ing] straight into the air [before] run[ning] off into Shoal[] Creek." (Doc. No. 64 at 18 (citing Nichols Decl., Doc. No. 12-2)). Riverkeeper also points to the opinion of its expert Barry Sulkin that overflows reached navigable

waters of the United States. (*Id*. (citing Sulkin Decl., Doc. No. 59-1)). Mr. Sulkin's opinion is based on his March 17, 2022 inspection of ten manholes and pump stations. (*Id*.). Together, these locations account for a total of over 100 overflows between September 6, 2016, and April 12, 2020. (*Id*.). He found that all of the manholes and pump stations either had debris still on the ground, which indicated the overflow had reached the creek, or were in such close proximity to the water that any overflow would reach a creek. (*Id*.). Mr. Sulkin further opined that Shoal Creek, Little Shoal Creek, Coon Creek, Hardy Branch, and the unnamed stream at the Etheridge Ball Pump Station "all appear to have sustained or perennial flow, have a defined bed and bank, and an ordinary high water mark" and are jurisdictional waters subject to the Clean Water Act.

Defendant argues Mr. Sorkin's opinion is insufficient to create a question of fact on whether the alleged overflows reached waters of the United States because it is "based on proximity alone – even when [the discharge points] are not that close [to the waters]." (Doc. No. 66 at 4). Defendant argues such a "conclusory" expert opinion is not sufficient to withstand summary judgment. (*Id*.).

The Court finds sufficient evidence from which a jury could conclude that the alleged discharge reached waters of the United States based on the declaration of Neal Nichols stating that he observed sewage running into Shoal Creek (Doc. No. 12-2 at ¶ 4) and the opinion of Barry Sulkin that sewage discharged from points between three feet and 50 yards from specified waters reached those waters (Sulkin Decl., Doc. No. 59-1). Accordingly, Defendant's motion for summary judgment based on Plaintiff's alleged insufficiency of evidence on this element will be denied.

Plaintiff also moved for summary judgment on this claim. (Doc. No. 59). To prevail, Plaintiff must show there is no genuine issue of material fact as to any essential element of the

17

claim. Again, Defendant challenges Plaintiff's proof that the alleged pollutant reached navigable waters. Although Plaintiff has provided sufficient evidence on this element to withstand Defendant's motion for summary judgment, viewing the evidence in the light most favorable to the non-moving party (now the Defendant), a reasonable jury could find the evidence does not show that the pollutants reached the water.

In essence, this element presents a true question of fact for the jury and the claim is not amenable to judgment for either party at this stage. Plaintiff's motion for summary judgment will also be denied

## IV. CONCLUSION

For the reasons stated, Defendant's Motion for Summary Judgment (Doc. No. 56) will be **GRANTED** as to Count 2, and **DENIED** as to Count 1. Plaintiff's Motion for Summary Judgment (Doc. No. 59) will be **DENIED**.

An appropriate Order will enter.

_____
WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE